of America et al, case number 25-PC87, Nicholas Talbott et al. v. United States of America et al. et valent. Mr. Mannion for the et valent, Mr. Minkert for the appellee. Morning, Mr. Mannion. Morning, Your Honor. You may proceed when you're ready. Morning, Your Honors. May it please the court, Jason Mannion on behalf of the United States and the federal defendants. If I may, I'd like to reserve five minutes for rebuttal. In 2018, after months of study by a panel of experts who produced the 44-page BANIS report, President Trump's military leaders enacted a gender dysphoria policy that was materially similar to the policy at issue here. After a few district courts enjoined that policy, this court vacated one of those injunctions, allowing that 2018 policy to go into effect, and the Supreme Court did the same for the other injunctions elsewhere around the country. Earlier this year, President Trump's military leaders again enacted a materially similar gender dysphoria policy based in part on that same BANIS report and evoking many of the same justifications that led the Supreme Court to vacate the injunctions in 2019. And we ask this court today to follow the Supreme Court's lead in Parnowski and those other cases and to vacate the injunction below. When the district court here entered the injunction against the 2025 policy, it made many of the same mistakes that district courts made when analyzing the Madison policy in the first instance. And the first one of those was that it treated a gender dysphoria policy as instead a policy that swept more broadly and focused on a person's expressed gender identity. But that's not what this policy does. This policy, like the policies that every other administration in the last 10 years or so has done, focused on a medical condition and related medical treatments, focused on gender dysphoria, and it focused on medical treatments related to that condition. And so it was just clearly erroneous for the district court to treat this policy as being a broader policy than it was. How can you say that when somebody who has no medical condition, has never been diagnosed with gender dysphoria, but who has transitioned and who lives in a sex other than their birth sex is explicitly banned by the policy? It's clearly banning all transgender persons. Well, I disagree with that last part, Your Honor. Each of the policies that existed before, and this policy as well, allow people who identify as something other than their sex to serve in their sex. This policy allows that, so did the Madison policy, so did the Carter policy, so did the Austin policy. But the Madison policy, importantly, grandfathered in people who were incumbent service members and who were accessioned under the Carter policy and had shown that they were fully able to serve, that they were mentally and physically fit to meet the otherwise trans-neutral military standards. And those people were grandfathered in under Mattis, and Mattis himself made that determination. And here there's no such grandfathering, so it's a different policy. So I agree that there is a difference in the exceptions to the general rule that both of those policies put in place, but I don't think that it's a difference that has a constitutional dimension to it. Well, assuming a rational basis review, it may have a constitutional dimension in the sense of explanation. So you said, and there's two questions on the table, I don't want to confuse the line of inquiry, you said that this is not a transgender ban because it allows people who identify as transgender to serve in their birth sex. But the record in the case includes and adopts as a fact-finding the supplemental declaration of, I think it's Mr. Brown, Professor Brown or Dr. Brown, who says that the do-to discussion of that category of people, people who may identify as transgender, but eschew entirely any transition, he says that is not really a transgender person. He said it would be somebody who would, if given the opportunity, would want to transition, not that you're allowing transgender people to serve in the military if you're allowing people to serve as long as they don't transition. A couple of points about that, Your Honor. I mean, first of all, that's quite different than the same expert's view in DOE 2. And if you look at the DOE 2 published concurrences from Judge Wilkins and from Judge Williams, you'll see that it was shared agreement about the definitions in that case, in part based on that same expert's view. And that expert has since said, no, no, I was misunderstood. And that's in the record in this case. It wasn't in the record there, but it is in the record in this case. So if we're deferring to a record and to what's currently been done in the military, rather than to my colleagues some eight years ago, what's your answer to that? So your argument that this is not a ban on transgender service is that you can serve as a transgender person as long as you don't serve as a transgender person. Is that right? I certainly wouldn't put it that way. I think that it's our view that this policy, like each of the policies that preceded it, targets a subset of the category you're talking about. It targets the subset that has the diagnosis of gender dysphoria, which is marked by that significant clinical distress and the impairment of functioning that applies in social, occupational, and other important areas. And so we think each of the policies here have drawn the same type of line. It's a line that the Supreme Court allowed us to take several years ago. But I think even if you disagree with me about the scope of the policy here, we think we still survive constitutional scrutiny. And that's because we think as an initial matter, a rational basis applies even to policies or laws that have a scope that affects all people who identify as transgender. And even if you don't want to adopt that as—I realize there's a circuit split on that issue—even if you don't want to adopt that view as to every policy in every context, the military is different. That's the through line through the— Sorry, circuit split on what issue? Just on the standard of review that covers policies that affect—  No, I mean that affect the category of people who identify as transgender. Okay. And it's just whether that's a rational basis. Outside of the military. Right, right. So outside of the military context, I realize there's a circuit split, but I don't think this Court needs to wade into that circuit split in this case because of the military context of this case. Mr. Mannion, in reviewing a preliminary injunction, we have to review findings of fact for clear error. And here the District Court found that the government acted with animus. So what is your best argument for why that is clear error? So I think even if you are required to defer to the factual view that there was some animus motivating this decision, I don't think that resolves the legal question of whether you can shortcut the deference that would normally apply to this decision. And so I would point the Court to Trump v. Hawaii. Are you conceding that there was animus? Well, I'm not. But I understood in your question to be that you have to review that as clear error. Do you think it was a clear error to find animus? I think it's certainly clear error to find that the policy can't be explained by any reason other than animus. I think that's apparent on the face of the policy. And that's the relevant question. The relevant question is whether the policy can be explained by any reason other than animus or whether there is a possible…  That's from Trump v. Hawaii, primarily. But they made a finding that it wasn't the policy there that the third so-called Muslim ban was not in fact a Muslim ban because it had been… the anti-Muslim tweets were before the President's office and the policy that ensued covered maybe 8% of the world's Muslim population. It was done after a careful study by global experts in the terrorism that it's trying to attack. Here we have something altogether different. We have a sitting President issuing an executive order that has animus on its face, not directing anyone, any panel of experts to study the issue, but simply directing the Secretary of Defense to implement a ban on transgender, on service by transgender persons. And within a month, the Secretary of Defense, doing so with no further study other than the Mattis policy, which itself characterized the terrain at the time as having to… that's requiring a lot of prediction. So we had no… it's a far cry from the situation in Trump v. Hawaii, is it not? I mean, I disagree, Your Honor. I think… So walk us through that. Sure. So I think there are a few of the things that you mentioned would have been the exact same arguments that the plaintiffs in Trump v. Hawaii would have made. The fact that the policy at its genesis was surrounded by campaign comments or by tweets from relevant officials that were characterized as displaying animus. The initial genesis of the policymaking in Trump v. Hawaii included comments on the face of some of the initial documents. Those were tweets, not an executive order by a sitting President. Right? In Trump v. Hawaii. So it was certainly at least tweets. And so I apologize if I misstated anything there. But there, too, you had a claim that early on in the process that there was animus being shown to a protected group of people and that that bled through throughout the entire policymaking process and affected the entire policymaking process. By the time we got to the Supreme Court, the Supreme Court looked at those comments. I think it's fair to say it was even critical of those comments as maybe not showing the level of tolerance or respect that some might want them to show. But still, the Supreme Court said, we are not analyzing just the comments of one particular president. We are analyzing the power of the presidency itself. And the Supreme Court said, even if there's some indication of animus earlier in the process, the relevant question is whether the policy can be explained by anything other than animus or whether it's impossible to discern a legitimate basis. All right. I mean, the district judge, in her opinion, in Addendum 48, has a detailed seven-point distinction between the so-called Muslim ban that the Supreme Court sustained in Trump v. Hawaii and the ban at issue here. Trump v. Hawaii, the ban was patient-neutral. Here, it's not. Trump v. Hawaii, there were months and numerous working groups that were – there was months of time that passed from the pre-inauguration Muslim ban tweets and the policy in Trump v. Hawaii. And here, the transgender ban tweet of HGSAF and Trump right after the HGSAF policy issued. But more importantly, the executive order itself was really not separated by any study, any time, any deliberation. The executive order wasn't separated from the policy that ensued with multiple iterations and fine-tuning of the ban in Trump v. Hawaii, one iteration of the ban here. There's just a lot of daylight. So are there other cases that you would say support the prerogative of the military when it's entitled to deference, to act with animus against a group? I can't recall off the top of my head whether the Supreme Court's other military deference cases included allegations of animus or not. But I would like to just return to that comparison that you were describing. I mean, certainly as an initial matter, for the reasoning of a decision to apply, not all the facts need to be the same. But I think one of the critical errors in that description that you just read to me is that this policy built on months of study, this policy built on expert review as well. Sure, that had occurred when President Trump was president the first time, but it's just not the case that this was a starting-from-scratch policy in as quick of a time as Shadray has described. This is built on months of study, 40-page policy that came from expert review, from interviews with service members who identified as transgender, interviews with their commanders. You're talking about the Mattis. That's right. The Mattis study. Yes. So the Mattis policy, as I mentioned, said that there was an absence of experience, and so at that time it was necessary to be predictive. And my question is why we have nothing in the record about the experience under the Austin policy that the military has had for four years of transgender people joining and transgender people serving openly. I mean, some of the concerns that are raised in Mattis are presumably then wrestled with by the military in that period, and we've given no information about what's been done. Privacy, fairness concerns that are mentioned, there's nothing offered by the government about whether and how those issues prove to be problematic.  So it's our view that on rational basis review that there's not a requirement for the government to produce evidence to show that a policy is rationally related to a legitimate government objective. How do we assess whether it's rationed? We don't assess if the evidence is Z and the government says A. That's not relevant to our assessment under rational basis review where the military is involved. So in the rational basis review context, I think you look at the reasons given by the government and you assess whether those are rationally related to the objective the government's trying to pursue. And here I think this policy easily passes rational basis review. So if the military said people with red hair are just too fragile and vulnerable, we are going to kick them all out of the military and we are going to not allow any of them ever to join. And we have no evidence of that, but we think they're a threat to military preparedness, to unit cohesion, and too costly, and so we're just going to kick them out. That is rational enough under military deference? Well, I don't think you need to find what the outer edges of rationality are in order to uphold this policy. I don't think so either. I don't think so either. Because this policy relies on a condition that is marked by severe clinical distress or impaired functioning in occupational and other important settings. And clearly for a condition like that, particularly when viewed under the deferential lens that you're required to review the military's assessment of risk and their judgment about risk tolerance, if there are mental conditions that will impair someone's ability to function in the military, or that the military could rationally judge would impair that, then that's more than enough to satisfy rational basis review. And that's evidence that all transgender people covered by this ban, or any of them, pose this kind of risk. The evidence in the record is what? So I don't think we put evidence in the record, or we didn't put evidence in the record about these particular plaintiffs, or whether these particular plaintiffs. No, no, I'm talking about any transgender people in the military, because there have been thousands of them now. There are thousands of them now. And so what I'm just wondering about, because, for example, I hear you, and I read the record, and so I know that it does say, as you just said, that gender dysphoria can be associated with depression and suicidality, things that would be and are actually already of concern, and appropriately so, to the military when it's choosing who it can bring on board. And I think, as your brief said, 70% of people in the eligible age group are not eligible to join the military, because the standards are really demanding, right? So I understand that. I guess the question is, if the concerns are with depression or suicidality, there already are standards that would screen someone out for those things, right? So I think, yes, it's true that there are standards in place that address some of the components that are associated with… …of the sex other than their birth sex. That person who's highly skilled, who's strong, who's patriotic, who wants to serve in the military, that person is banned by this policy. Why? I think the military invoked multiple reasons here that interact, but even if you don't think one of those stands alone, there's not a constitutional requirement that each individual reason proffered would be enough standing alone to justify a policy. It's just that there'd be a rational connection, and it can be a tenuous rational connection, presumably, because we're in the context, on my hypothesis, of no heightened scrutiny and a high degree of deference to the judgment of military leadership and military. So there doesn't have to be a tight fit. Right. And so even if particular individuals within the group may have had periods of stability, may be totally functional in a military setting, the condition is still one that is marked by that significant clinical distress, that impairment of functioning in occupational and other settings. Mr. Rainey, I have a question related to Judge Pillard's questions, which is that even if the government's policy passes scrutiny, what about the decision to categorically treat everyone in this class, right, to choose administrative separation for all the service members who fail to meet the new criteria? Should the military be required to take an individualized determination, and is the decision not to make individualized determinations some indication that this is a, you know, that it is treating people the same based on their transgender status? This is one thing to set the criteria, and then it's another thing how the military or the government chooses to implement those criteria. So I'm asking, I guess, about the implementation. Is the implementation rational? And I don't think the implementation here is nearly as unusual as my friends on the other side suggest. A recent additional example of the military making a categorical judgment to send, a categorical medical judgment to send soldiers and service members through the administrative process that you're describing would have been the COVID-19 vaccines. And there, too, the military separated groups of people based on a medical judgment that their refusal to take the vaccine would have impacts on military readiness, etc. And they did that through the same administrative separation policy that's at issue here. And that itself is also not unique. The military uses this administrative separation procedure for a number of reasons, including reasons that also touch on medical bases as well. And so I don't think that there's any sign here based on the procedure at the back end that there's animus or irrationality in the way that the government is treating the issue. Can I ask about that? On the front end, there are these very rigorous requirements, failure to satisfy or disqualifying 75% of eligible people. And they cover seemingly modest conditions like asthma and so on. So what happens – put aside all the transgender stuff. Just in general, what happens on the back end when there is a service member serving who discovers some – is found to have some condition that would have been disqualifying at the accession stage? Is it a discretionary judgment by a military board? Is it administrative separation? How does the military handle that? I don't know if I have a complete answer to that. And maybe I will when I get back on rebuttal. But it's my understanding that many conditions – I don't know if it's all conditions, but at least many conditions do go through a more individualized process. Is there any condition, medical condition, other than gender dysphoria or transgender status that doesn't go through a medical evaluation board? If you develop depression, if you develop allergies, if you turn out to have OCD that was undiagnosed when you joined, anything that you're aware of that is routed through an automatic separation rather than a medical evaluation board? I don't know of one off the top of my head. I can't say with certainty that there aren't. It's not identified in your brief? I don't believe so, no. Or anywhere in the record that you – that the government participated in developing? Not that I'm aware of, your Honor. Was the government given a full opportunity to participate in the development of the record below? Yes, Your Honor. We had the option to present witnesses if we wished to do so. So, I'd like to hear about irreparable harm, but just since we're into the likelihood of success on the merits, the motion for stay characterizes that 2021 MSARA study as having found that nearly 40% of service members with gender dysphoria were non-deployable over a 24-month period. And that seemed important to me, and that's something that you were relying on. I looked at the report itself, and it actually doesn't say that they're non-deployable for a 20-month period. It says at some point during the two-year period of analysis, there was some non-deployable days. And in fact, that very report generally doesn't have basis of comparison, but it does choose to look at people with depression for some of the factors as a basis of comparison. And the transgender people did better in terms of both deployability, consistency of availability to deploy, and tenure, remaining tenure of service than people with depression. So, the notion that this supports the need for this particular bar and this particular process seems not as strongly supported by that MSARA report as the brief suggests, and I'd be interested in your response on that. Well, I hope our brief didn't misquote the report. It does mischaracterize it. As far as I can tell, that's why I'm asking for your response. Well, if it does, I apologize to the court. I think your description of the report is correct. Judge Reyes focused on that same point as well. But this MSARA report doesn't stand alone or anything close to it. This report is one of multiple sources, the most important of which, I think, is that MADIS policy that we started off the argument discussing. Does the accession policy or only the retention policy bar persons with symptoms consistent with gender dysphoria but no diagnosis? So, both policies have that same scope, and I can point you to a record site to support that, the addendum 198 to 199. The initial policy, I think, is less clear on that point, but there were subsequent guidance that linked the standards for accession and retention together. I also want to point out that footnote 2 of an additional guidance that we added in support of our motion to state the injunction gives the definition of that phrase Your Honor was just referring to. And it's not just any symptoms. It's symptoms that would be sufficient to support a diagnosis under the DSM-5. On the waiver standards, as I read it, the waiver for members who are already serving is more difficult to get than the waiver for accession. Because both of this directly supports warfighting capabilities requirement, and then the accession standard is full stop there, and the retention standard has these three other elements, 36 months, and so on. What sense does it make to make it harder at the retention stage than at the accession stage? I think Your Honor may be looking at the initial policy, perhaps, that Sorry, I don't have an app site, but it's memo at pages 4 and 6 of the operative memo. Well, I would, since the initial memo was issued, there have been some different guidances that have clarified the scope. And so I would point this court to, in our addendum, pages 198 and 199 to an additional guidance document that links these requirements, the 36 months of stability, for example, as being the same for accession and for retention. On all of these elements that I mentioned? Yeah, each of those three. The two waivers. That's right. And on the symptoms consistent with, how would that be implemented? There are how many million active service members? I believe a couple million. I don't know the exact number. So the government, 1.3 million service members, the government is going to review the medical records of all of them to identify those who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria. That's the plan. I don't have additional cover that I can offer this court about how that will be implemented. But if a basis for exclusion is if you have symptoms consistent with, then you just wait and see whether some fellow service member observes something that they think is consistent with gender dysphoria, or how is that going to be implemented? The best that I know, and it's not a complete answer, is that it will be based on review of medical records, but I don't know in what pattern or how that will happen. And how about for people who are seeking to enlist? I don't know the answer off the top of my head. I'll try to have one for you on your level. Can you tell us about the government's claim of irreparable harm? I mean, we're here not on the merits. We're here because the government has requested the extraordinary relief of a stay pending appeal and consideration of the preliminary injunction. And the government comes when it has a claim that it will be irreparably harmed if it has to wait for the court to rule and do courts. So what is the irreparable harm? So my first point on that is I think that the Supreme Court necessarily determined that there was irreparable harm from the government not being able to implement the 2018 version of this policy when it also stayed injunctions against the government being able to do so. I think the main injuries that we have are both the general injury in the inability to enforce what we believe to be a valid policy, but I think it's heightened in this context because of the military context. This is a core area of presidential power. This is something where the military has determined that this policy will increase the readiness and effectiveness of the military and the fact that not being able to enact it would be harmful to the military. And so we think all of those add up to the irreparable harm that we're invoking here. So I think you said the government has determined that the policy will impair military readiness and unit cohesion. And so the government, the current leadership in the Department of Defense has a judgment that it hasn't shared with the court that the military's readiness and unit cohesion suffered over the four years of a different policy. I mean, so the evidence in this space has been characterized as being only like low to moderate level of reliability, and so there's... I understand that that also struck me. As I understand the low to moderate, that's because you can't do double blind studies ethically with something like transgender studies. So there are case studies, there's clinical observation, there's all the ability to track people, to work with them. People like Dr. Brown, who have worked with not just with transgender people, but transgender people in the context of the military for many decades. So there's low to moderate in a technical sense, but my understanding is really that the high is reserved for double blind. Do you have a different understanding of that? I don't know either way on that, Your Honor, but I have two responses, if I may. First, in this context, as in many other national security contexts, there's always a large amount of predictive judgment. The Supreme Court referred to it as prophecy in Hawaii v. Trump, but there's always a large amount of taking the available data, making predictive judgment on top of that. And the Constitution does not preclude different military leadership from having different risk tolerances in the face of uncertainty. Absolutely not. I agree. I agree. And the question is, has the department evaluated the risk given the large body of the most relevant evidence? Which is, how has the military worked when a different policy from the one the current administration prefers was in place? That seems like right there you go and say there's this problem, this problem, this problem, this problem. That is, I mean, you don't need much, but it's striking to me that the government apparently has not studied that. And I can't point you to a place in the record that shows that the government has, but I don't believe there's a constitutional requirement for the government to do that before enacting. But there is a constitutional requirement of non-arbitrary decision-making. And our argument today is that the military relied on an extensive policy from fairly recently and also relied on other more recent pieces of data in reaching the decision it made. I don't think rational basis requires anything more than that. Can I ask, is there a difference between the class, the people afforded relief, the class of people afforded relief here and the class of people protected by the injunction in the Ninth Circuit? Not that I'm aware of. I do have one. Can you, sorry, go ahead. Oh, sorry. I do have one update that I think will be relevant, may be relevant to the court, and that is, of course, the Ninth Circuit denied our stay motion. I'm aware of that, which is the next, leading to my next question, which is, can you tell us anything about the government's plans or pace for seeking Supreme Court review? I'm authorized to tell you that the government is going to seek a stay of the shilling that is going to do so imminently. I can't give you an exact date, but it will be there very soon. And I think that may well be quite relevant to the court's analysis as well. Is there any, do you think there are any differences in the questions presented at the stay stage in this case versus that one? Not in a way that I think would reduce the Supreme Court's decisions relevance here. The Ninth Circuit injunction, as I understand it, was based on additional claims as well. I think due process and First Amendment. I believe there are additional claims in that case. But all of the equal protection claims here are present there. Yes, Your Honor. All right. We've kept you up longer than your assigned time, and you will have your five minutes that you want to reserve. Thank you, Your Honor. If you want. Thank you. Thank you. We have Counsel Minter. Good morning, Your Honor. May it please the court, Shannon Minter on behalf of Appellees. The government has a high burden here, and it has not met any part of it. We just heard the government has not alleged any concrete irreparable harm it would suffer, especially between now and the time of this appeal being decided, just by maintaining a status quo that has been in place for almost ten years now, and hasn't shown that keeping that in place for a few more weeks is going to cause and identify literally no specific concrete harm. They certainly can't show that a stay would not substantially injure the plaintiffs here and the thousands of other transgender service members who face what this court referred to in seeing as a particularly heinous brand of discharge. They're going to be labeled unfit for service for a reason that has no relationship to their ability to do their job. The government can't show a strong likelihood of success in the merits here. I mean, the district court found that the government failed to present any evidence to support, not the Mattis plan from seven years ago, but the policy that they have actually now put into place, which is actually much more similar to the original ban from 2017, and the district court's findings on that are not thoroughly erroneous, and the government hasn't even made a serious effort to suggest they are. Counsel, you said that the government has a high burden here. What are you referring to? My sense is the government has actually quite a markedly low burden. It's seeking an emergency stay pending appeal that they have to show a concrete irreparable harm. There's not going to be substantial harm to the other parties and a strong likelihood of successful merits. I mean, the plaintiffs here, you know, they're- You're not assuming a heightened constitutional review. Not at all. Well taken, but of course the state standard is a high burden. Mr. Minter. So just starting with likelihood of success, you know, there's usually a wide chasm between rational basis and heightened scrutiny, but here with the military, you don't quarrel with the proposition that just for framing level of scrutiny, the most relevant cases are Goldman and Rosker, the military deference cases. And in order to prevail on the merits, you need to overcome the deference doctrines in those cases. We do not quarrel with that, Judge Katsas. I do think the government has drastically overstated. Understood. But yeah, no.  You get some degree of review and maybe it's rational basis plus or whatever it is, but those are the cases that lay out the framework. No question. Yes. And then we do think the district court here properly deferred to the government the importance of the asserted interest and took that very seriously as she should have. Mr. Minter, if I can ask you about the remedy here. So the district court imposed effectively a universal injunction on this policy, going beyond any relief to these particular plaintiffs. So even putting aside the constitutional question, isn't the government likely to succeed on challenging this remedy, the universal injunction at issue here? I mean, the Supreme Court has indicated in a number of cases that these injunctions go beyond the authority of the federal court. You know, Judge Rowell, I don't think so because for a few reasons, but here the very nature of the injury, I mean, it's one of those cases where the injury alleged resides directly in the categorical nature of the policy itself, which declares that transgender people as a group lack the virtues of honesty, discipline, selflessness, integrity, that as such they have to be purged from the military based on, you know, because they're transgender and because the government has this very negative view of what it means to be a transgender person. So I think that the key principle in terms of the scope of the relief is that it should be geared towards the nature of the injury. So I don't know how one corrects the categorical. Is there a class certified here? Right, I mean, it's still part of the role of the federal courts to address individual harm. Absolutely. It's just that the nature of the harm inflicted on every single individual transgender person is a group based harm. I mean, they're being categorized based on negatively by the government based on their membership in a group. So and just as a sort of practical human reality matter, I just don't see how it would work. If the relief is limited only to these individual plaintiffs, then they're being sent forth to be deployed. They could be deployed anywhere or just assigned anywhere in the world. And what are they? They're going to be serving as an exception to a policy that declares them by virtue of their identity to be categorically unfit. They're going to have to disclose that to the people they're working with. So I don't know if it would be like, hey, I'm a plaintiff in this case. Otherwise, I would be subject to administrative separation. I don't know how it functions effectively. Just understand how you think about the definition of a person who is transgender. Because this policy allows people who identify as transgender but are not seeking, you know, who are not diagnosed with gender dysphoria, who are not seeking to transition anyway, those people who are transgender are allowed to serve. And the district court, I don't believe, made any kind of finding as to a definition of transgender person that would exclude individuals like that. And, you know, two judges of this court just a few years ago, I think about five years ago, Judge Wilkins and Judge Williams, recognized that, you know, transgender is a broad category and that there are people who are transgender who do not have gender dysphoria and who do not seek to transition. So does the categorical nature of your argument depend on a different definition, transgender person? Yeah. I think the record this time around is very clear about what transgender means. And I do believe that the judge did make findings confirming that based on the expert testimony of Dr. Brown and of the plaintiffs themselves, that in this case it is clear that a transgender person is someone who lives in a sex different than their birth sex or would do so if they were able to. I think Judge Wilkins in his concurrence in Doe 2, I think he just noted that there was some confusion in the record about that. And that was one of the things he said would be, you know, cleared up in further proceedings in the district court. Did the district court find that there could not be a transgender person who meets these criteria or just that it was unlikely? I mean, I don't believe that the district court defined a transgender person in a way that couldn't meet, that there couldn't be at least some people who identified as transgender who could meet the government's criteria. Well, gosh, Deidre, I believe she did. She did, I believe. Well, I'm so sorry. I don't have the opinion in front of me, but Holly can help me there. But she, particularly in her discussion of the waiver and whether the waiver would be available to any transgender person, that's where she, that's one of the places where she refers back to the testimony of Dr. Brown and explains that there would, that such a person, she can't imagine how such a person should. She can't imagine it. That's not a finding or a definition provided by the court. I do think the record is very clear. Yeah, she says virtually no one can meet all those criteria and notes that, you know, the plaintiffs for their part do not. Yeah, I think what we can say is that... But the remedy isn't just for these plaintiffs. It's for everybody who identifies as transgender. Yeah, I think what we can accurately say is that the record in this case is clear, that the transgender person is the definition that I just read or stated, and that the government did nothing, offered not a shred of evidence to rebut that in any way, shape, or form, and that the district court credited that definition and understood that based on the criteria in the excess policy that anybody who has transitioned, taken steps to transition, wishes to transition, is not going to be able to serve. And that is... And that there are no transgender people who are outside of that category. All transgender persons wish to transition. Is there a finding to that effect in the record? I do... I'm not a... I did not see that finding in the record. So maybe... I heard you say you didn't have the district court's opinion in front of you. But in her footnote one, she says, Defendants concede the term that it uses, those with a gender identity that diverges from their biological sex, is transgender person. And I believe the language in which she's taking from the policy is actually to express gender identity different from their birth sex, which I think does incorporate an element of it's not just a silent, subjective identification inside your own head, but something that you are communicating to the world. Let me put it this way. I think this is also really the focus of the Brown Supplemental, George Brown Supplemental Declaration, where he's responding to the Doe II reliance on his definition. He says in his previous declaration, he defined transgender individual as a person who has a gender identity that is different from the sex they were assigned at birth. And then he says he wants to clarify that it isn't tenable to be transgender and be disabled from living in accordance with the gender identity different from your identity at birth. He said he was describing individuals who live or who would live if permitted in accordance with that gender identity. And he said, I did not mean to suggest there are transgender people who have a gender identity different from their birth sex, who do not wish to be able to live consistent with their gender identity. So I guess what that's saying to me is Dr. Brown says that it would be unstable and risky to, and not really meaningful to a person who's transgender to say, you can remain in the military as long as you deny and suppress that you internally experience yourself as transgender. Yes, thank you, Judge Pillard. Yes, I mean, I'm looking particularly at 430 and paragraph 13 of his supplemental declaration where he said, I did not mean to suggest there are transgender people who have a gender identity different than their birth sex, who do not wish to be able to live consistent with their gender identity. And there is no contrary evidence from the government in the record about that. What about in the Mattis report that found that only some 900 of almost 9,000 transgender service members had been diagnosed with gender dysphoria? And that, you know, the Rand report, which said only a small fraction of people, service members who identified as transgender would utilize transition related health care. So it seems like there is evidence in the record that there are transgender service members who do not, you know, use transition related care and who are not diagnosed with gender dysphoria. And those transgender individuals continue to serve under this policy. I mean, that's evidence from actual service members. Well, Dr. Brown does address that and, you know, at 431 and paragraphs 18 and 19, where he says those statistics should not be misinterpreted to suggest that many transgender individuals have no desire to live in accordance with their gender identity. He talks about the different manner, the different ways of transitioning. Social transition is often the most critical aspect of transition for many transgender individuals, which is not encompassed in the. Well, even accepting all that may be true. That doesn't mean some transgender individuals couldn't or would not want to continue to serve in their in their biological sex and remain in the military. But just quickly add in paragraph 19, the data about transgender individuals desire to transition in taken in the context of a person facing hostility, social opprobrium, or negative consequences. If they transition, which would be the case for people serving in the military prior to 2016, should not be interpreted to mean there are transgender people who do not wish to live consistent with their gender identity. I do think that is what the record suggests. That is the medical consensus and understanding. It's consistent with the testimony from actual transgender individuals in this record from our plaintiffs. And yeah, I don't think that is this time around very well established in the record. Can I ask a question about the history of these policies? The first change in policy was under Secretary Carter. And then the policy shifted back under Secretary Mattis. And each each of those secretaries did a lot of inquiry. The policy then from Mattis to Austin shifted again. Did Austin do independent inquiry or did he just rely on Carter? The reason I ask is I saw something the district court made a reference to the effect that Austin convened a working group. And unless I missed it, the site was actually to Carter's working group. Yes, your honor. I believe that is correct. I do think after... Austin relied on Carter. He relied on the Carter working group, although then I do believe they undertook to flesh out and create the entire new policy that he was putting into place. I do believe that there was a lot of study and meeting and something that one could also refer, you know, accurately, I guess, refer to as a working group. But that, yeah, that was to implement that new policy or put more meat on the bones. Do you have anything that you wanted to add about your brief about the animus? Yes, and I guess I have... I'm interested in how the district court's finding of animus and the evidence of animus in this case and the lack of any challenge by the government to the finding is totally erroneous. How that interacts with rational basis review and in particular in the military context. Well, there are... Yes, I think what's so important and striking about this policy is that, you know, it does something that is so extraordinarily unusual. We just don't see ordinarily in this day and age the government openly just with, you know, complete transparency, expressing animosity towards a group of people and openly relying on that as a justification for a policy. And, you know, this is that rare case where we do have that. And I think the district court properly, you know, noted that, that unlike... I mean, of course, there is a whole line of cases under rational basis review where the government has said, you know, even if we're not dealing with a group that has an established right to heightened scrutiny, if there's a policy that singles out a group for disfavored treatment, that's something that the court, even under rational basis review, is going to take, you know, a careful look at. But usually you have to, to some degree, infer that. And here, as the district court noted, no, you know, no inference is required because it's stated, you know, repeatedly over and over again that being transgender is incompatible with honesty, selflessness, discipline, integrity. And that expressing what's referred to as a false gender identity is incompatible with, you know, high ideals of military service. And that's just a recurrent thing. I'm assuming and accepting the district court's finding of animus and asking sort of where does that leave the government? And Mr. Mannion said that on this record you can't say that there was only animus behind this policy, that it can't be explained by any other reason. And I'm not sure whether he's proposing that if there is another reason, if it's a not healthy test, or how one looks at that. And I'm curious what your view is on that. I understood. Yeah, sorry, Judge Block. Yeah, no, as the, you know, district court pointed out, every single case where the court has found animus, the government has put forward an alternative legitimate justification so that we know that cannot be enough. In Romer, they said it was saving resources. In Moreno, it was fraud. In Cleaver, it was safety and disruption to the neighborhood. So, obviously, if just a mere assertion of what would be a legitimate consideration can't be enough where the court has previously found animus, I think here, I mean, what that triggers, the obligation when the court finds animus, what that triggers on the part of the court, it is going to take a careful look at whatever asserted justification the government asserts and determine whether it kind of holds up under scrutiny. I mean, you know, at this point in seeing, even though it was applying heightened scrutiny, it actually found that the policy there wasn't even rational just by looking at the government's other practices, the government's inability to explain why it was treating this one group of people, not extending opportunities for exemptions to them that extended to other people. And so I think the same sort of thing applies here. The government here said, no, no, this is just a medical policy. This, you know, yes, there's animus, but we have this other legitimate consideration going on here. But then I think, you know, the district court properly, you know, took a careful look at that. And the problem with that justification, aside from the language, which is, I mean, we don't talk about people with diabetes or heart conditions being dishonest or undisciplined. I mean, that alone is just a big, big flag that this is not just an ordinary medical policy. But then there's other provisions, and Judge Fulard, you've been alluding to them, that don't have anything to do with the medical condition. You have to serve in your birth sex. That's not related to a medical condition. And you can't express a gender identity that's divergent from your birth sex. Even in sort of the mechanics of the policy itself, you can't have done anything to pursue a sex transition. And that's either or, either to get treatment for gender dysphoria or to pursue a sex transition. So none of that is related to a medical condition. But then I think one of the most striking things here is that there's no other medical condition that shunts the person automatically into administrative separation. I mean, for literally every other medical condition, you go through a medical review process and, you know, trying to determine, are you still able to do your job? So that, I mean, that's just every indication is that this policy is not set up in a way that would make any sense if it really were about worrying about medical issues and medical concerns. So I think all of that is, you know, entirely appropriate under a rational basis review. You don't dispute at all, do you, that military readiness, unit cohesion, cost, those are all valid military interests that are unquestionably accepted, that we, the court, must unquestionably accept. We do not dispute that, no. I think that part of what the analysis was is to determine whether, yeah, when a court is confronted with a military policy that does what this policy does, which is single out a group for dysphoria treatment, they're going to look, well, is this based on sort of a considered professional judgment? Is there evidence supporting it? And does the policy further those interests? And it's just, it's very hard under even just ordinary rational basis review to understand how, even if the military has set up mechanisms to screen people for fitness to serve and to have any kind of medical condition, there's a process already set up to determine, well, can you still do your job? They screen for the sort of collateral issues that the government says are associated with transgender people with elevated risk of suicidality, for example. I mean, there's already mechanisms set up to screen for that. So it seems like literally, just in a very fundamental way, like the only thing that you accomplish by having this categorical ban is you are excluding people who otherwise are qualified, who have already proven they're qualified and that they can do the job. And that, I don't think, that is not rational. All right. Thank you, counsel. And we'll hear again from Mr. Min for the government. Thank you, Your Honors. Just a couple of brief points. Let's just start with Judge Rao's question about the scope of the injunction and the likelihood of success on that point as well. Even if this court thinks that, given the stay posture, that a stay is inappropriate as the plaintiff's here, we do agree that, or we do believe that we have a high likelihood of success on the scope of the injunction. And what's your best, I think you mentioned this in a sentence or so in your brief, your best take for that? So I don't have my brief in front of me, so I'll rely on the cases we cited there. But more broadly, Judge Rao has invoked two reasons why a universal injunction would be necessary here. Her first reason was just a fear of follow-on complaints that other— I'm sorry, I may have misspoken. Did you make this argument in your brief? We did make the argument towards the end of our brief there on the scope of the injunction. It's not very fleshed out, given where the— It says, right, there's just a phrase, at a minimum, stay the injunction as it pertains to the policy regarding accession and stay the universal scope. But there isn't any citation. I guess that's why it was in my mind to ask you. There's a whole section here. The injunction is overbroad on page 26. It's a short section, but I think the whole— Yeah, and I agree. I agree it's a short section. I think we fully preserve that argument here. And where Judge Rao is worried about the possibility of future litigation. Of course, the whole point of the critique of universal injunctions is that they shortcut the normal process where litigation can be brought, where law can percolate. It ups the stakes for each individual case. And so I think that—I think what you pointed to there, the fear of B-2 complaints, that's the problem with the scope of the injunction. That's not— On the birthright citizenship issue. So we'll get some guidance from the Supreme Court. Sure. One context on the question of universal injunctions. I agree. And so if the court—and so we have more full arguments that we will certainly make on this when we have more space in our briefs, but we do believe that we have a high likelihood of success on the scope of the injunction as well. When you say that—I mean, there's a medley of arguments sort of in that last page and a half. But when you say you have a likelihood of success on the scope of the injunction, you're referring to the notion that you think you're likely to succeed, that the injunction should be narrowed to these individual points. Yes, Your Honor. Because courts have a constitutional authority to resolve cases and controversies, because of the equitable powers and the traditional limitations that adhere in those equitable powers, because of the Article III hierarchy where typically it is the Supreme Court that has a nationwide say on something and where district courts are resolving that. So we weren't able to flesh that out in as much detail as we hope to in future briefings, but I did want to raise that. I also want to briefly talk about the Amterra report and, Judge Pillar, your question about the statement about trans-identifying individuals being able to stay in service longer. It also says at Addendum 172 that having a longer in-service time does not equate to deployability. And it acknowledges that trans-identifying service members have a much higher rate of disability evaluation for psychiatric and other disability and mental health issues. I think it's interesting to me, because it was a higher rate of change in disability evaluations, but this period that was being examined was the period immediately after the Carter policy was announced. So you would imagine people would be seeking psychological consultation over their condition in potential preparation for transition. So these are like rates of maybe four times a year going to see a counselor. Are there other – when you're an incumbent service member, if you have depression or adjustment issues, are you allowed to, without threatening your status in the service, go to see a counselor? Psychotherapy? I have a guess. I don't have – I cannot tell you that with certainty. So if you've developed depression or – I mean, I presume you would if you had PTSD from combat service, and you're still in – the service is not disabling, but you want to see somebody to talk about it. I believe that to be true. I just don't – I can't tell you that with certainty. So at the end of the day, the military has very high standards for who can join the service. Most people cannot do so. It's not a stigmatizing thing to those people for not being able to do so. And as I started, this court and the Supreme Court allowed the MADIS policy to go through several years back, and we'd ask this court to allow this policy, which is materially similar, to go through it as well. Thank you, Your Honors. Thank you. Thank you all very much, and the case is – the application is submitted.
judges: Pillard; Katsas; and Rao